UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| v. | § | CRIMINAL ACTION H-17-413 |
| | § | |
| HUAN DOAN NGO | § | |

## ORDER

On March 10, 2020, a hearing was held to consider the government's motion to exclude defendant Huan Doan Ngo, D.O.'s ("Ngo") expert witness testimony. Dkt. 88. Having considered the parties' arguments, evidence and testimony submitted, and applicable law, the court is of the opinion that the motion to exclude should be GRANTED.

### I. BACKGROUND

On December 18, 2018, the United States brought six charges against Ngo. Dkt. 50. The superseding indictment charged Ngo with (1) conspiracy to commit health care fraud ("Count 1"); (2) conspiracy to defraud the United States and pay and receive health care kickbacks ("Count 2"); and (3) four counts of false statements relating to health care matters ("Counts 3-6"). *Id.* All counts relate to an alleged scheme involving home health certifications. *Id.*

On July 5, 2019, Ngo filed a notice of intent to offer expert evidence pursuant to Federal Rule of Criminal Procedure 12.2(b)(1). Dkt. 65. The government moved on December 2, 2019, to exclude Ngo's Rule 12.2(b)(1) evidence on five grounds:

(1) the Insanity Defense Reform Act ("IDRA") proscribes evidence of a mental defect or disease that is not closely related to the defendant's intent at the time of the allegedly criminal acts;

(2) defendant's expert testimony is inadmissible under Federal Rule of Evidence 702 because his expert's methodology is unreliable;

(3) the risk of unfair prejudice and confusion outweigh the proposed evidence's probative value;

(4) defendant's expert seeks to introduce inadmissible hearsay; and

(5) FRE 704 precludes an expert from opining on an ultimate issue.

Dkt. 88. Alternatively, the government requested a *Daubert* hearing on Ngo's proposed expert testimony. *Id.* at 14. Ngo responded on December 21, 2019, arguing the government inappropriately characterizes the purpose for which Ngo intends to offer the proposed expert testimony, and requests a *Daubert* hearing to allow the court an opportunity to consider the evidence. Dkt. 91. The government replied on December 17, 2019. Dkt. 93. Ngo filed his expert's report as a sur-reply on January 3, 2020. Dkt. 95.

A hearing on this motion was held on March 10, 2020. Prior to presenting his expert's testimony, Ngo asserted the proposed testimony was relevant and admissible under the IDRA because it refutes an essential element of the government's case, namely whether Ngo had the necessary specific intent at the time of the alleged crimes. Mot. Hr'g Tr. at 3:11-7:4, March 10, 2020 [hereinafter Tr.]. The government argued that the IDRA barred Ngo's proposed testimony because it would amount to an excuse or justification affirmative defense, which Congress eliminated when it enacted the IDRA. *Id.* at 15:2-19:21.

Ngo proceeded to examine his expert witness, Diane M. Mosnik, Ph. D. ("Mosnik"). *Id.* at 20:7-88:1. Mosnik avers to be an expert in clinical neuropsychology and forensic psychology, who was hired "to confirm or rule out a diagnosis of autism," and determine if Ngo displayed any "specific deficits . . . that may be associated with autism." *Id.* at 21:6-7. She examined Ngo for approximately twelve hours over three separate occasions. *Id.* at 76:25-77:8. Mosnik also reviewed Ngo's medical records, including a prior psychological evaluation conducted by Dr. Natalie

2

Montfort ("Montfort"). *Id.* at 49:12-23. Montfort diagnosed Ngo with autism, which Mosnik confirmed after her evaluation of Ngo. *Id.* at 31:4-12; 49:19-23. Mosnik specifically diagnosed Ngo with "high functioning autism." *Id.* at 40: 21-23. Prior to his indictment, Ngo had never been diagnosed with autism. *Id.* at 37:6-9.

According to Mosnik, autism's signs and symptoms fall into two categories. *Id.* at 32:15-17. The first is "persistent deficit in social interaction and social communication, [which is] characterized by a deficit in social and emotional processing and emotional reciprocity." *Id.* at 32:18-20. This impacts individuals' ability "to understand . . . social relationships with peers." *Id.* at 32:21-22. The second category is a "restrictive and repetitive pattern of motor behavior, attitudes, interests, [and] thoughts." *Id.* at 32:25-33:1. This manifests in part "as the rigid adherence to fixed patterns of behavior," such as self developed rules and routines. *Id.* at 33:4; 45:5-46:3. Autistic individuals "tend to be rule bound," meaning "they formulate rules for certain things and once those are formed they follow those religiously in a very rigid and inflexible manner." *Id.* at 46:10-13. Autism is "considered present at birth[, but] typically manifests itself usually about 18 months [to] two years of age." *Id.* 38:16-17. Patients "do not recover" from autism—"[i]t is a neurodevelopmental condition with known brain impairment deficits . . . that is present throughout [a patient's] life." *Id.* at 39:12-17.

Ngo demonstrated "deficits in social perception, social and emotional processing, and social problem solving"—all "core features and hallmark features of autism"—during Mosnik's evaluation. *Id.* At 41:22-25. Ngo has difficulty "understanding the non-verbal aspects and social cues [that others use to] determin[e] what somebody is saying and what is the meaning of the words they're

using." *Id.* at 43:25-44:3. Mosnik testified that Ngo's brain, due to his autism, "does not have the capacity to perceive" others' intentions. *Id.* At 43:6-22; *see also id.* at 44:21-25.

Mosnik also discussed Ngo's understanding of home health certification. Mosnik stated that Ngo believed "he had the requisite knowledge base" to make home healthcare assessments, but admitted "he had some difficulty understanding what [homebound] meant." *Id.* at 78:24-79:15. Ngo interpreted homebound "in a very concrete manner," specifically any person who "can't access or use transportation very well." *Id.* At 79:15-21. Ngo further refined his definition of homebound as anyone "needing to use Metro Lift[1] because they had chronic medical conditions," but never researched the definition of homebound and was unsure how to do so. *Id.* At 79:21-80:6. Mosnik testified that Ngo's definition for homebound is consistent with the "rigid and inflexible" thinking that is "one of the hallmark[s] of autism." *Id.* At 80:15-21.

Mosnik ultimately offered three opinions:

(1) Ngo's "brain is incapable [and] has severe deficits in his ability to perceive . . . and then interpret information in social contexts in the environment around him." *Id.* At 78:4-6.

(2) Ngo's "abilities to demonstrate the capacity to engage in social problem solving" is impaired. *Id.* at 78:14-17.

(3) Ngo "obsessively and rigidly adhere[s] to [his] rules . . . in a restricted or repetitive manner." *Id.* at 84:1-6.

---

[1] Pursuant to Federal Rule of Evidence 201(b)(2), the court notes that "METROLift provides transportation for persons with disabilities who cannot board, ride or disembark from a METRO fixed-route bus, even if that bus is equipped with a wheelchair lift or ramp." *What is METROLift and How Does it Work?*, Metropolitan Transit Authority of Harris County, https://www.ridemetro.org/Pages/MLWhatHow.aspx.

## II. LEGAL STANDARD

The court "has broad discretion in the matter of the admission or exclusion of expert evidence." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119 (1962). Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). Accordingly, expert testimony is admissible only if it is relevant. *Piptone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993)).

Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. But even when evidence is relevant, it may not be admissible if a federal statute proscribes it. FED. R. EVID. 402. Moreover, Rule 403 allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

## III. ANALYSIS

Congress enacted the IDRA on Octber 12, 1984. *See* H.R.J. Res. 648, Pub. L. 98 473, 98 Stat. 1837 (1984). It defined the insanity defense as "an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). Congress further decreed that "[m]ental disease or defect does not otherwise constitute a defense." *Id.*

However, Congress did not address whether evidence of mental disease or defect is admissible to negate an element of the prosecution's case. *See United States v. Boyd*, 773 F.3d 637, 642 (5th Cir. 2014). The Fifth Circuit has not addressed this issue directly, but other circuits have determined that such evidence is admissible under very limited circumstances. *See id.* at 642-43 (citing *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990); *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987)). The court will "look to *Pohlot* and its progeny for guidance" as it has in the past. *See United States v. Fleming*, No. 07-CR-513, 2009 WL 10680618, *2 (S.D. Tex. Apr. 13, 2009) (Miller, J.)

After careful examination of the IDRA's legislative history, the Third Circuit determined that "evidence of mental abnormality to negate mens rea" is admissible under the IDRA. *Pohlot*, 827 F.2d at 903. But the *Pohlot* court distinguished this from evidence tending to show the defendant "lacked the *capacity* to form the mens rea," which is inadmissible because it "distracts and confuses the jury from focusing on the actual presence or absence of mens rea." *Id.* at 903-904 (emphasis in original). In *Cameron,* the Eleventh Circuit agreed that evidence must tend to "negate intent and not merely present a dangerously confusing theory of defense more akin to justification and excuse" if it is to be admitted. *Cameron*, 907 F.2d at 1067 (citing *Pohlot*, 827 F.2d at 906).

At the outset, Mosnik explained that her training and experience was critical to help the court "in determining a number of threshold issues including *determining the capacity of an individual to form [intentional] criminal responsibility and criminal culpability*." Tr. at 27:2-4 (emphasis added). She then repeatedly stated that both autistic individuals and Ngo lacked capacity to understand the social environment around them or develop adequate social problem solving skills. *See e.g.*, *Id.* at 23:23-24:23; 32:20-23; 41:16-42:10; 43:15-19; 44:21-25; 78:13-17; 84:22-85:9. For

6

this reason, Ngo argues that he did not possess the specific intent required for any of the counts against him. But this evidence is at best "a dangerously confusing theory more akin to justification and excuse," if not simply evidence of such impermissible affirmative defenses. *Cameron*, 907 F.2d at 1067. Permitting this testimony would only confuse the jury as to whether Ngo could ever form the intent required, not elucidate whether he had formed the mens rea during the period in the indictment.

The IDRA proscribes psychological evidence that a defendant lacks the capacity to form the requisite mens rea, and Rule 402 deems evidence contrary to federal statue inadmissible. Further, Rule 403 allows evidence to be excluded if its potential to confuse the issues and mislead the jury substantially outweighs its probative value. Mosnik's testimony must be excluded.

### IV. Conclusion

For the foregoing reasons, the government's motion to exclude Ngo's expert witness testimony (Dkt. 88) is GRANTED.

Signed at Houston, Texas on March 13, 2020.

_____
Gray H. Miller
Senior United States District Judge